CUTRER, Judge.
This suit arose out of an automobile accident which occurred on May 27, 1979. The plaintiff’s vehicle was struck from the rear *649 by defendant’s pickup track. A settlement was entered into regarding the property damages. The plaintiff, Kathleen Thames, then brought suit against the defendants, Clebert Zerangue, Jr., and his insurer, Safe-co Insurance Company (Safeco), for personal injuries allegedly caused by the accident. The jury rendered a general verdict in favor of the defendants and against the plaintiff. A judgment was rendered accordingly. The plaintiff appeals. We affirm.
The issue is whether the jury was clearly wrong in this determination.
The facts are as follow:
Both the plaintiff and the defendant were proceeding in a southerly direction on the Evangeline Thruway, or Highway 167, in Lafayette, Louisiana. Both drivers were in the left-hand lane. The defendant testified that he was momentarily distracted by a car stalled in the right lane. When he directed his attention back to his own lane, he saw the plaintiff’s vehicle directly in front of him and could not avoid hitting it from the rear and knocking it into the car ahead. The defendant’s truck suffered about $450.00 in damages and the plaintiff’s 1978 Toyota was a total loss. The defendant pleaded guilty to a charge of following too close.
It is clear from the relatively brief testimony concerning the occurrence of the accident that the defendant’s conduct constituted negligence. He admitted being inattentive to the lane ahead of him although only momentarily.
When a rear end collision occurs, the driver of the following vehicle is generally presumed to be negligent and will only be exonerated where he can reasonably explain the cause of his running into the vehicle ahead. Coates v. Marcello, 235 So.2d 162 (La.App. 4th Cir. 1970); Hester v. Stewart, 177 So.2d 430 (La.App. 1st Cir. 1965). The defendant here made no such reasonable explanation.
The principal issue at trial and the question upon which this decision must turn is whether the plaintiff established that she suffered injuries as a result of the accident. This is a factual determination. The appeal court should not disturb the findings of the trier of fact in the absence of manifest error. Canter v. Koehring Company, 283 So.2d 716 (La.1973). Manifest error means clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). With this principle in mind we will examine the record to determine if the jury was clearly wrong in failing to award damages.
The plaintiff testified at length to the effects of the accident. She also described in great detail the various diagnostic tests which she underwent. She stated that after the accident she started suffering severe headaches, occasional blurred vision, intermittent swelling of the right arm and stomach ulcers.
On cross examination plaintiff admitted that she had trouble with her arm swelling before the accident. She stated that she complained of it to her family physician in January 1979, six months before the accident. Also, she admitted that she had visual problems before the accident. Plaintiff felt that the stomach ulcer, which was diagnosed by a family physician over a year after the accident, was the result of stress due to her financial problems which arose as a result of medical expenses and expenses resulting from her having to purchase a new car.
The record reflects, however, that practically all her medical expenses were timely paid by a group insurance company (Metropolitan) and by Safeco, as they became due. Also, she admitted that the purchase of the new car increased her monthly car note by only $25.00. Plaintiff also stated that she continued her work after the accident except for those days she was seeing doctors for examinations and tests.
Plaintiff called two co-workers (plaintiff was a newspaper reporter), her father and sister, as “before and after” witnesses. These witnesses testified generally that the plaintiff had not incurred any swelling of her arm nor any visual problems before the accident. They had noticed these problems after the accident.
*650 Dr. Richard Hill, a family practitioner, had been the plaintiff’s family physician for sixteen years before the accident. He testified that plaintiff had “a long list of psychological problems.” He stated that plaintiff was a type of person who would come to his office with a “laundry list of complaints.” She would actually write out a list of her complaints. Dr. Hill testified that plaintiff complained of headaches and visual problems (blurred vision) in January 1979, five months before the accident. He also stated that even though plaintiff had many complaints over the years both before and after the accident, he had not been able to find any physical condition, except the ulcer of 1980, that would explain plaintiff’s complaints.
Dr. Hill saw plaintiff July 27, 1979, about two months after the accident. Plaintiff was complaining again of swelling and numbness of the right arm. His examination revealed no basis for the complaint. He sent plaintiff to a Dr. Clifford, a neurosurgeon, for examination. This physician reported to Dr. Hill that the tests he performed were negative.
Plaintiff saw Dr. Hill twice in October 1979 for reasons wholly unrelated to, trauma.
Dr. Hill saw plaintiff again in April 1980. She was having pain in her stomach as well as lower abdominal pain. Her stomach pain proved to be the result of a gastric ulcer. The diagnosis of the ulcer was made on May 27, 1980. The ulcer had healed by October 1980 when the plaintiff returned to Dr. Hill’s office. Plaintiff had also been to Dr. Hill’s office on July 21,1980, with acute torticollis, spasm in the muscles of the neck. The muscle spasm could be felt. This was the first time Dr. Hill could illicit spasm in her neck and this was about fourteen months after the accident. He was of the opinion that this neck spasm could not be related to the accident of May 1979.
Plaintiff was referred to Dr. Albon Young, a neurosurgeon of Lafayette, Louisiana. Plaintiff was complaining of arm and visual problems.
The history given to Dr. Young was detailed. We shall quote parts of same as follow:
“Q. When was the first time you saw her?
“A. I saw Ms. Thames on December 28, 1979 at the request of Dr. John Charles Dugal.
“Q. What purpose was she referred to you?
“A. Ms. Thames was referred to me for evaluation of multiple complaints including complaints referable to her right arm as well as transien visual disturbances.
“Q. And you made a Neurological examination?
“A. I did.
“Q. What did that consist of?
“A. Historically Ms. Thames responded to me that she had first begun to complain of visual disturbances in the early part of 1979 as well as an episode of swelling with respect to the right arm early that year. The right arm symptoms apparently resolved spontaneously whereas the visual disturbances persisted. She was seen by a Neurosurgeon as well as a local physician in Baton Rouge who performed an evaluation, an extensive evaluation, including hospitalization and multiple invasive tests. These were felt to be non-remarkable. Ms. Thames then came to Lafayette where she saw Dr. Dugal and because of some continued complaints Dr. Dugal suggested that I evaluate her. At the time that I saw her in December of 1978 she gave me that history stating that also in June . . .
“Q. Excuse me, when you said December of 1978 do you mean . . .
“A. Excuse me, 1979.
“Q. I just wanted to keep . . . thank you.
“A. At that time she described problems related to the right arm since June of 1979 and persistent since that time. She stated on that date that there was also some vague loss of strength of the right arm. In the interval she was worked up in Baton Rouge and these *651 symptoms had persisted at the time when she saw me.”
Referring to the work up that had been done in Baton Rouge, Dr. Young stated that:
“A. The patient underwent a lumbar spinal tap, diagnostic study to look at the contents, chemical and cellular of the spinal fluid. She underwent four vessel cerebral antiograms, a study utilized in demonstrating the vascular characteristics of the brain and she also underwent a computerized axiotomagram of the brain known as a CP scan with and without contrast enhancement. All of these studies were interpreted by report, I must emphasize I have not seen these studies, but by report these studies were interpreted as normal.”
This physician also found some decrease in the muscles of the back of plaintiff’s hand near the thumb. He felt that this condition could be an indication of nerve root compression in the cervical region. He was aware that prior x-rays had reflected a normal cervical condition. He suggested a myelogram. Plaintiff refused this. He prescribed medication and a cervical collar.
Dr. Young saw plaintiff again on May 12, 1980. Plaintiff told him she never used the collar and that she had taken her medicine for only one week. Plaintiff reported that the arm and cervical problems had resolved themselves.
Dr. Young stated that his prior evaluation of a possible nerve root problem was based primarily upon the subjective complaints of the plaintiff. Also, he stated that the complaints of visual impairment were not connected to any trauma. Such a problem, if it did exist was attributable to migraine headaches or vascular abnormality.
Plaintiff consulted with a psychiatrist, Dr. David Rees, on one occasion, on July 9, 1980. She was complaining of stomach problems. This physician’s diagnosis was as follows:
“Q. I have a report dated August 20, 1980, did you reach a psychiatric diagnosis of Kathleens [sic] problems?
“A. The diagnostic labels that I used were acute situational adjustment reaction with psycho psyehiologic gastro intestinal symptoms. The words are not that frightening really, it’s just a fancy way of saying that she was distressed and her stomach hurt. If you would like me to explain all those terms I will.”
The history that plaintiff related to the doctor was that she had an automobile accident in May 1979 and that the immediate results of that accident were severe headaches, some visual impairment and numbness and weakness in her right arm. The problems persisted from June through November 1979 during which time she saw several doctors and has hospitalized four times for tests. The medical bills and purchase of a new car caused financial distress which, coupled with her problems in working, caused by the symptoms in her arm, caused emotional distress. That distress caused her to develop gastric symptoms in February 1980 and an ulcer was diagnosed.
The doctor testified that the problems related to him by plaintiff can cause stress and that these stresses can manifest themselves physically. Chronic muscle tension can develop in the neck so that these muscles ache and headaches ultimately develop as a result. He stated that plaintiff’s migraine headaches could probably have been precipitated by this stress. He also stated that her stomach ulcer could be caused by stress.
We must not overlook the fact that the history upon which Dr. Rees based his conclusions differs from the history as related by Dr. Hill and Dr. Young. Dr. Hill testified that the plaintiff had complaints of headaches and visual disturbances January 1979, five months before the accident occurred. Dr. Young stated that the plaintiff related a history of visual disturbances dating since before the accident and, further, Dr. Young refused to relate such symptoms directly to trauma. Dr. Hill also testified that the plaintiff had a history of gastric complaints. The plaintiff had had stomach trouble as a child and he had found inflammation of the G. I. tract or gastreoenteritis as late as January 1979.
*652 Dr. Rees also discussed the anxiety caused by medical expenses and the fact that such anxiety could be the cause of the ulcer. Dr. Rees was not furnished the information that plaintiff’s medical bills were paid directly by insurance. In fact, the total expenses incurred by the plaintiff pri- or to the discovery of the ulcer, which were not reimbursed by her insurer, were less than $200.00
A detailed review of the medical testimony reveals that plaintiff’s complaints of arm and visual problems preceded the accident of May 1979. Further, the consensus of opinion among the physicians was that the complaints of arm and visual problems were neither caused by nor connected with trauma of the accident. Likewise the problems of stomach ulcers were not related to the accident.
The jury had the duty to evaluate the testimony and consider the weight and credibility that it would attach to such testimony. We are not to disturb such evaluation by the jury unless the evidence reflects that the jury committed manifest error or was clearly wrong in its evaluation. We find that the evidence would support a finding that plaintiff’s complaints were not related to the accident.[1]
For these reasons, the judgment of the trial court is affirmed. The costs of this appeal shall be paid by plaintiff-appellant.
AFFIRMED.

. In the very recent case of Napoli v. State Farm Mutual Automobile Insurance Company, et al., 395 So.2d 720 (La.1981), the Supreme Court was faced with a very similar factual situation. Plaintiff was a passenger in a vehicle which was struck from the rear. The car was a total loss. The plaintiff failed to prove trauma related cervical injuries. The medical testimony reflected that the plaintiff’s cervical problems preceded the accident. The jury award of “$.0” was affirmed.